

FILED & ENTERED

JUL 01 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Nhungu   DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>Riverfront Ventures, LLC, a Delaware limited liabi,<br><br><br><br><br><br><br>Debtor(s). | Case No: 1:09-bk-18832-MT<br><br>Chapter: 11<br><br>**MEMORANDUM OF RULING RE VALUATION OF PROPERTY FOLLOWING EVIDENTIARY HEARING ON CREDITOR EAST WEST BANK'S MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY [Originally entered due on docket for case no. 1:09-bk-16565MT due to clerical error]** |

## I. Introduction

East West Bank (the "movant") has filed two motions for relief from stay. The first motion relates to real property, the legal description of which is Fresno County DOC-2005-0111102 ("Single Family Parcel"). The second motion also relates to real property, the legal description of which is Fresno County DOC-2007-00665617 ("Industrial Parcel").

The debtor obtained two loans from the movant in the amount of $1,410,000 (secured by a trust deed on the Single Family Parcel) and $1,180,000 (secured by a trust deed on the Industrial Parcel). Each of the trust deeds are in favor of the movant.

The motion for relief from stay as to the Single Family Parcel alleged that the property is worth only $820,000, while the outstanding debt is $1,523,122. The motion concerning the Industrial Parcel claimed that the debt is similarly undersecured, with the property valued at $810,000 and outstanding debt of $1,278,049. The debtor filed oppositions to each of the motions for relief from stay. In the oppositions, the debtor asserts that the value of the properties is significantly higher than the value claimed by the movant. Additionally, there is a dispute as to how much is precisely owed due to a disagreement over default interest.

The Single Family Parcel consists of 10.77 acres and is approved for the construction of 85 single family homes. The Industrial Parcel consists of approximately 5 acres and was zoned for 200,000 square feet of Class A industrial space. The Debtor also previously owned a parcel consisting of 230 single family lots (the "CPB Parcel"), which was sold in a previously approved transaction.

The debtor was not able to obtain a formal appraisal of either the Single Family Parcel or the Industrial Parcel in time for the initial hearing on the motion. In its initial opposition, the debtor submitted the declarations of both David Schwartzman (the debtor's principal) and Bradley Woomer (the debtor's Chief Financial Officer). The debtor later filed a declaration of its appraiser, followed up by a report after the final hearing. An evidentiary hearing was held over four days. Appraisers Robert Farwell, Chris Stavros, and Jack Alexander testified. One of debtor's principals, David Schwartzman, also testified.

## II. Law

A movant may be entitled to relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property . . . ." 11 U.S.C. §362(d)(1). The term "adequate protection" is not defined in the Bankruptcy Code, but may include "1) periodic cash payments equivalent to decrease in value, 2) an additional or replacement lien on other property, or 3) other relief that provides the indubitable equivalent," including an equity cushion. *In re Mellor*, 734 F.2d 1936, 1400 (9th Cir. 1984) (citations omitted). Merely being undersecured is not sufficient to justify cause for relief or the order of adequate protection payments; rather, the property must also be declining in value. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988).

In addition to cause under 11 U.S.C. §362(d)(1), relief from the automatic stay may be granted where the debtor does not have any equity in the subject property and the subject property is not necessary for an effective reorganization. 11 U.S.C. §362(d)(2). "In order to meet its burden of proving that property is necessary for an effective reorganization under 11 U.S.C. § 362(d)(2), a debtor must prove that the property is important to the reorganization and that the reorganization is feasible." *In re Cambridge Woodbridge Apts., LLC*, 292 B.R. 832,

- 2 -

840 (Bankr. N.D. Ohio 2003).  This requires "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*," meaning a "reasonable possibility of successful reorganization within a reasonable time."  *Timbers*, 484 U.S. at 375-76 (emphasis in original). Whether property is necessary to an effective reorganization is a "moving target which is more difficult to attain as the Chapter 11 case progresses." *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 75 (9th Cir. BAP 1994), *citing In re Holly's Inc.*, 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992).  Once the exclusivity period has expired, "the debtor must demonstrate that a successful reorganization within a reasonable time is assured." *Id.*

### III. Findings of Fact

Appraisers and Appraisal Methods Used:

Jack Alexander is a California Certified General Appraiser and currently completing the course work for an MAI and SRA designation.  He has significant appraisal experience and has done a significant number of appraisals in the Fresno area.    He has been qualified as an expert witness in numerous cases in California. His testimony was at time evasive and too generalized.  He was persuasive in highlighting certain site improvements to both parcels and one comparable for the Single Family Parcel, but not persuasive on most other points.

Robert Farwell is a California Certified General Appraiser with an MAI designation.  He has extensive appraisal experience and was the supervising appraiser on the Cushman & Wakefield ("C&W") report.  He has also been qualified as an expert witness in numerous cases in California.  Christopher Stavros, a California Certified General Appraiser, assisted him with the appraisal reports.  Farwell had not visited the properties used in the C&W appraisal, but that was not required where another member of the team responsible for the report had done so. Both were professional, thorough and convincing in their choice of most comparables and the adjustments made thereto.

Mr. Schwartzman also submitted declarations and testified as to the value of the properties.  He has no appraisal experience but has been a developer for 19 years. He has built 3500 homes and condominiums and been involved with 50 different real estate projects, a

- 3 -

Main Document    Page 4 of 14

number of them commercial real estate. While he is quite knowledgeable about both residential and commercial real estate developments, he was not as qualified to render an opinion on actual value as the three certified appraisers who testified. His approach assumed various factors which simply have not been shown to exist in this market, most notably funding to complete such real estate developments in the Fresno market. He relied on a Discounted Cash Flow Method for the Single Family Parcel.

Mr. Schwartzman's testimony can only be considered where specific site improvements are supported with documents or photographs and where his personal knowledge of the property was supported by sufficient specific detail. His testimony on any other subject was just too loose and unsupported. He originally declared that the Single Family Parcel could be completed with a $5.4 million construction loan, but in his testimony he proposed a theory where he could complete construction with only $600,000 out of pocket. He was inconsistent and confusing on a number of other areas and appears to be just throwing out any theory which supports his plans for the property, regardless of how realistic it is.

All four witnesses were very familiar with the Fresno area. Alexander's appraisal experience in Fresno, especially as to industrial properties, was not as extensive as that of Stavros or Farwell. The C&W appraisal report done by Farwell and Stavros was completed on or about February 15, 2010, while the Alexander appraisal was incomplete at the time of the hearing, but conducted around March 30, 2010.

Alexander and Schwartzman attacked the C&W appraisal fairly vociferously. After Farwell and Stavros explained their conclusions in detail, it became clear that most of the criticisms were unfounded. The debtor has set up straw men to knock down with respect to extensive testimony relating to zoning and projected use, the type buildings planned for the Industrial Parcel, and appropriate appraisal method.

Zoning

Each of the witnesses testified about the correct zoning of the sites at issue as well as some of the comparables. In some situations, the properties would need to be rezoned for the uses intended. In every case, however, it appeared that this was easily done and the use either had already been approved or would easily be approved. All the discussion of the 2005

or 2025 general plans were also largely irrelevant for the same reason as well as because both the C&W and Alexander appraisals evidenced awareness of the 2025 plan. Debtor alleged that Farwell's assumption of agricultural zoning for the Single Family Parcel caused his valuation to be wrong. The appraisal's analysis, however, is based on an assumption that residential housing can be built on the site consistent with the debtor's site plan. The zoning of the subject properties are non-issues and do not materially affect the value. The intended light industrial use appears to be the likely outcome of any future use of the industrial property, and any buyer is likely to assume such zoning is easily obtainable. (See C&W appraisal at p. 20-21.) The Single Family Parcel is also in compliance with current and future zoning rules. The zoning needs planned by the debtor were the ones taken into consideration for the sales comparisons.

Appraisal Method

Schwartzman attacked the comparable sales analysis used by the movant's appraiser, as there are so few comparable sales, and they go back as far as 2 years. According to Mr. Schwartzman, the comparable sales analysis is inappropriate for these properties because of the development he proposes. He argues that the proper analysis should employ the income model and a residual value analytical model. Using these models, the debtor concludes that the Single Family Parcel has a value of $2,742,525. Mr. Schwartzman argues as to the Industrial Parcel that the income value is the more appropriate valuation method, and under that analysis the Industrial Parcel will be worth $12,752,164 after construction, resulting in $5,101,478 in equity.

Farwell testified that the cost analysis method would not be appropriate here because the market is oversupplied, and with such raw land, there is insufficient information about future costs available. He also stated in his appraisal report that there would likely be negative value with such an approach because of the slow absorption rate for new development in the Fresno market for the next year or more. Alexander did not directly contradict Schwartzman but seemed to rely exclusively on a sales comparison approach as well. The sales comparison approach is the only appropriate one to use in these valuations in light of these market conditions. Significantly, the debtor's plan and disclosure statement confirms that new

financing is not available except as a priming lien for the development required for an income model or residual value approach. With no financing to complete the development, anything but a sales comparison valuation is not realistic here.

### Nature of Approved Plans

Alexander criticized Farwell for assuming one large 200,000 square foot warehouse on the Industrial Parcel when, in fact seven smaller ones were planned. This criticism appears to be misplaced as the C&W ("C&W") appraisal assumed the smaller buildings at the inception. (See Addendum B to Industrial Appraisal)  Farwell's later declaration and testimony appears to have been solely in response to arguments raised by the debtor. Woomer filed a declaration in opposition to the motion for RFS and provided his analysis of the costs and income for a 212,990 square foot structure on the site. (¶ 21, Woomer Declaration.)  Schwartzman first adopted Woomer's statements (¶17, Schwartzman Declaration), but then testified at the hearing that rather than one large structure, the plans were for seven smaller industrial buildings.  Mr. Schwartzman's testimony and Exhibit 2, the architectural site plans for the parcel, resolved the question of what was being planned for the site.  Riverfront Ventures has received plan approval for seven smaller industrial buildings.

There does not appear to have been any confusion over the size of the approved buildings when the C&W appraisal was written.  Farwell's testimony was in response to the Schwartzman and Woomer declarations, and related to the income valuation approach championed by Schwartzman.  Farwell's conclusions as to value have not been impeached by this issue and are still consistent with the sales comparison approach most applicable here to raw land.

### Existing Site Improvements

There was testimony concerning what improvements have been made to each parcel and how this compares to the improvements made to comparable properties. Stavros testified credibly that he took site improvements into consideration when he prepared the appraisal. Farwell was, however, not aware of some of the site improvements.  Farwell did check the City of Fresno Land Division and Engineering Department and found no storm drain or flood control for the Industrial site.  Schwartzman's testimony that gas and utilities had been brought to the

pads of the proposed building sites was uncontradicted.  There had also been some rough grading of the streets on the Industrial site.  There was never any summary of exactly what had been done to each site and how that differed from comparable sales.

The debtor seeks to have any improvements made to the sites added dollar for dollar to the Bank's valuation totals. This approach is not supported by a sales comparison approach. Stavros already took some of the improvements into consideration, and the condition of the property is relevant solely as it compares to other properties, not for the specific amounts spent on improvements.  Given the extent of the site improvements shown through Schwartzman's testimony, however, Stavros minimized the site improvements somewhat in his comparisons to other properties.  The amounts spent on a site were never shown to translate to a dollar for dollar increase over the C&W conclusion.

### The Industrial Parcel 's Value

While Farwell called the location of the Industrial Parcel "pioneering ," the analysis provided by Stavros and supported by Grubb & Ellis data, demonstrates that it is simply an inferior location over many of the comparables for industrial warehouse space. Alexander's assertion that the northwest submarket is superior for industrial space was not supported by the evidence. Although Alexander said that Herndon and Highway 99 is a big commercial area, there is a higher concentration of industrial properties in the southeast division.  The subject property is at the extreme northern perimeter of the industrial area, three miles from where most space is rented.  This affects the quality of the comparables used as properties in the southeast are generally in a superior location.

Alexander's industrial comparable properties hinged heavily on the assumption that the subject's location was equal or superior to other industrial properties that had sold. He also did not adequately distinguish between potential commercial or retail space and industrial warehouse space.  The flyer for property for sale right down the street from the debtor's property suffered from that same problem.  Not only was it not yet sold, but it was for commercial property with much greater visibility.

The C&W appraisal uses much better comparable sales in reaching its conclusion. Although Alexander testified that a number of the C&W comparable sales did not actually close

or that he had trouble locating them, Stavros' rebuttal testimony demonstrated that these sales did, in fact, occur and the details contained in the original appraisal report were accurate.

Because the C&W appraisal minimized the improvements to the site, but otherwise was solid and persuasive, movant's value of $810,000 will be used and $400,000 is added based on Schwartzman's testimony as to what improvements were made. While this may not be the exact adjustment required in comparison to similarly improved sites in the area, it provides additional credit for improvements that were actually made, but reflects that the C&W appraisal already contemplated some work was done.  It is not higher because no comparable sales evidence or testimony was provided indicating that the market would adequately recognize much value in only partial utility access, some road base and incomplete grading. Sales prospects are still low for this parcel.  Over the next 12 months, vacancy rates are expected to increase in industrial space in this area and rents will remain flat. (C&W report at p. 15).  The total value of the Industrial Parcel is, accordingly, $1,210,000.

<u>The Single Family Parcel</u>

The C&W comparables were mostly similar in size and took the location of the subject property into account.  The testimony of how the subject property differed from Clovis adequately explained the adjustments made for location on movant's comparables 1 and 2. The fact that a few of these comparables were originally farm land causes comparables 4 and 5 to be somewhat on the low side given that there was more site development done at the subject parcel.  Credit for the site work is discussed below in evaluating how the per acre cost should be increased.

In general, only numbers 1 and 6 were persuasive on Alexander's choice of comparables.  The remainder were shown to be poor comparisons. Alexander used a 1 acre site located near the Fresno Airport as comparable sale.  Mr. Stavros' testimony was persuasive that this should not be used at all since it is so small and was purchased by the City of Fresno for a non-residential use.

Alexander points to the Barclay Square/Clovis Property as a inferior to the Single Family Parcel. Stavros' testimony was persuasive that this property was in an exclusive neighborhood where homes sell for three times the price of the homes to be built on the subject property.  Mr.

Alexander's positive adjustments to this property based on location and traffic flow make no sense.  The photographs taken by Stavros (Exhibit 7) combined with his description of the property demonstrate that the Barclay square sites are much further along than the Single Family Parcel because they contain finished streets and completed lots, each stubbed with utilities.

Alexander's comparable number 6 is a decent comparable property, similar in size and state of development.  His adjustment upwards of 50% for location, 40% for access and 50% for traffic, however, made the final comparable price not credible.  These were excessive adjustments.

The debtor faults the C&W appraisers for not visiting the debtor's comparables, forgetting that the debtor delayed getting any sort of appraisal on these properties until over nine months into the case when it was forced to address the movant's appraisal in a motion for relief from stay.  Mr. Alexander filed solely a declaration only a few days before the valuation hearing after the bank's motion was continued three weeks at debtor's request. There was little opportunity to visit each of Alexander's comparables, so the fact that Stavros did not visit all of them is of little weight, given Stavros' knowledge of the sales from other records.

The adjustments Alexander made for traffic count made no sense. These adjustments appeared to either contradict or duplicate other considerations of value, but had no meaning in the context of these sales.  Traffic count would be relevant if these were retail properties or if the property was in a poor location with traffic problems, but it appears to be used in Alexander's analysis to manipulate value.  Stavros' and Farwell's testimony that such adjustments were inappropriate was convincing.

Alexander criticized the C&W appraisal for the range in parcel size of the Single Family Parcel comparables, but then he does the same thing in his report.  He also faulted significant adjustments for distance from the subject property and date of sale, but again does the same thing with some of his comparables. The reality is that such adjustments are necessary in a marker where there are so few sales.  The limited number of sales must be used and the validity of the adjustments depends on the reason for it as well as the credibility of the appraiser.

Density of Building

Plans for the Single Family Parcel have been approved for greater density than the CPB parcel sold recently by the debtor. Every appraiser agreed that greater profit could be obtained by a parcel built with more homes. This is because the development costs for preparing the building sites are spread over a greater number of home sites. No witness credibly provided a specific amount or formula as to exactly what the greater value is. This appears to be just one factor to be considered, along with many others.

The debtor's extreme adjustment to value based on the sale of the CPB property is greatly inflated because the total amount required to prepare the different sites used in other comparables of both appraisers was never explored. Schwartzman's testimony and estimates to complete the project have also varied tremendously. Lastly, Alexander's use of other comparables raises issues that make his adjustments to the price of the CPB Parcel also suspect. An adjustment for density on this record would be speculative because the costs of existing property improvements on comparable properties used in each appraisal have not been broken out and compared with the subject properties.

CPB Parcel

The debtor owned a third parcel adjacent to the subject parcel. It was sold with court approval on March 15, 2010 for $6,785,000. It was used by Alexander as Comparable Number 1 but was not taken into consideration by movant. One reason for the discrepancy between the movant's and the debtor's value for the Single Family Parcel is the fact that the sale of the CPB Parcel happened after the C&W appraisal was completed. Because of the location of the parcel and the recent date of sale, both parties agreed that this property is the best comparable . The "CPB Parcel" is approximately 51 net acres and is located adjacent to and north of the subject Single Family Parcel. The sales price of the CPB Parcel came to $134,804/acre.

In light of this sale, the debtor contends that the value of its Single Family Parcel is $235,907/acre, based on an approved density of 1.75 times that of the CPB Parcel. This approach to density and how it affects total value was unsupported by any testimony or evidence. The testimony supported some increase in value, but did not provide a basis for a

specific multiplier.  In addition, the other comparables cannot be completely ignored where similarly developed properties to the subject sold for much less per acre.  The other comparables show a range in value from $42,222 to $129,002 per acre, averaging $66,884. (Farwell March 11, 2010 Declaration, paragraph 9.)

The movant's appraisal values the Single Family Parcel at $76,137/acre.  The movant correctly argues that site improvements are greater on the CPB Parcel, but did not provide specific estimates of how much it would take to bring the subject property up to the same level as the CPB Parcel.  Even Alexander agreed that the CPB Parcel had more curbs and gutters. Alexander and Schwartzman gave conflicting testimony about what improvements had been made to the site.  It appears both the subject parcel and the CPB Parcel are rough-graded and have sewers and fire hydrants. The photographs of the two parcels show dramatically different sites.  The CPB parcel shows clearer grading, plenty of base rock on the roads and extensive curbs.  The subject property is more overgrown, no curbs are seen and the roads do not appear to have base rock, even though Schwartzman testified that some was put down.  While the CPB Parcel has more site improvements and is closer to being ready to develop, the difference in site improvements does not justify C&W's valuation of $58,667 less per acre.  The subject Single Family Parcel is also much smaller – 10.77 acres compared to the 51 net acres of the CPB Parcel, so the improvements were already made to a greater amount of land. Lastly, the competition of so many home sites in a condition closer to development so close to the Single Family Parcel may not bode well for its development.

Using the same per acre price as the CPB Parcel is the best approximation that can be made here.  The movant's estimate of value is simply too low because the CPB sale was not taken into consideration, but how much higher it should be was never convincingly explained by either side.  The lack of evidence from the debtor on the application of a density variable and the lack of specificity by the movant as to how a site improvement differential should adjust the comparable price roughly balance each other out.  They both relate to future development costs. Any increased value in the subject property due to greater density is offset by its lower value due to less site improvement.  Multiplying the CPB Parcel's $134,804 an acre by the Single Family Parcel's 10.77 acres, the value of the Single Family Parcel can

Case 1:09-bk-18832-MT    Doc 98    Filed 07/01/10    Entered 07/01/10 13:26:35    Desc
Main Document    Page 12 of 14

reasonably be said to total $1,451,839.  Any greater increase would ignore the other comparable sales that the court has found credible.

## IV.    Conclusion

Debtor owes East West bank $1,523,122 on the Single Family Parcel and $1,278,049 on the Industrial parcel. As both properties are worth significantly less than the amount owed to the movant, even if the disputed default interest is not counted, it is clear that there is no equity for the debtor.  The question then is whether a reasonable reorganization is feasible. This requires "that the property is essential for an effective reorganization *that is in prospect*," meaning a "reasonable possibility of successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 375-76 (emphasis in original).  The debtor filed Chapter 11 on July 13, 2009.

Relief from stay is required at this point.  The debtor has had eleven months to market the property or find new financing to complete the development.  The best the debtor was able to propose is a plan that requires a loan that would have to prime the movant's already undersecured loan.  The exclusivity period in this case expired on February 28, 2010, and the plan as initially proposed by the debtor far from assures successful reorganization. Both motions for relief from the automatic stay are granted.

//
//
//
//
//
//
//
//
//
//
//

Debtor has requested that relief be conditioned on not allowing a receiver come in so that plan confirmation can still be sought.  At almost the one year anniversary of the case, the debtor has had sufficient time to confirm a plan and no further interference with the movant's rights to enforce it's state law remedies is warranted.  Movant has requested a waiver of the 14 day stay under FRBP 4001(a)(3).  This is denied given the complexity and significance of this ruling to the debtor.   There has been substantial investment by the debtor as well in these properties, so 14 days to consider its options is appropriate and generally provided for under FRBP 4001(a)(3).

East West Bank should upload an order in compliance with this ruling if it has not already done so.

DATED: July 1, 2010

_____
United States Bankruptcy Judge

- 13 -

**NOTE TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment. Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below: The United States trustee and case trustee (if any) will always be in this category.
**4) Category II.** below: List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. DO NOT list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **MEMORANDUM OF RULING RE VALUATION OF PROPERTY FOLLOWING EVIDENTIARY HEARING ON CREDITOR EAST WEST BANK'S MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY**
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of June 29, 2010, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Katherine Bunker    kate.bunker@usdoj.gov
- Cynthia M Cohen    cynthiacohen@paulhastings.com
- Bernard R Given    bgiven@frandzel.com, efiling@frandzel.com;shom@frandzel.com;bgiven@frandzel.com
- Mark S Horoupian    mhoroupian@sulmeyerlaw.com
- Michael A Isaacs    misaacs@luce.com
- Kurt V Jaenike    kjaenike@ch-law.com
- Alexandra Kazhokin    akazhokin@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- Victor A Sahn    vsahn@sulmeyerlaw.com
- Derrick Talerico    dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page